**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

**MARLYNE M. CAMPBELL,**                          )
                                                 )
          **Plaintiff,**                         )
                                                 )          **Civil Action No.**
          **v.**                                 )          **16-11232-FDS**
                                                 )
**BRISTOL COMMUNITY COLLEGE,**                    )
                                                 )
          **Defendant.**                         )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

**SAYLOR, J.**

This is an action for workplace discrimination and retaliation. Plaintiff Marlyne M. Campbell, an African-American woman, alleges that her former employer, defendant Bristol Community College, discriminated against her on the basis of her race and retaliated against her by firing her after she complained about the use of a term she believed to be a racial slur.

Campbell was hired as a probationary employee in August 2012. Within weeks, according to the college, there were significant issues with her work performance, as well as questions about her behavior. By December 2012, she had been terminated.

Campbell had been hired pursuant to a federal grant in support of a program called Massachusetts Community College Workforce Development Transformation Agenda, or MACCWFDTA. Apparently due to the cumbersome name and unpronounceable nine-letter acronym, people at the college (and elsewhere) referred to it as the "Mack Daddy" program.

Upon her arrival at the college, Campbell began objecting to the use of the term "Mack Daddy" on the ground that it represented a racial slur. According to the evidence, "Mack

Daddy" is a street slang word with several different meanings, one of which is "pimp."  The evidence that the term has a racial connotation is certainly thin, and there is no evidence that any official or employee of the college knew of any such connotation, or even that it was an offensive term.  In any event, whenever a college official or employee used the term in her presence, she complained, and there is no evidence that any such person persisted in using the term after she did so.

Campbell now contends that she was discriminated against on the basis of race, and that she was terminated because of her complaints about the use of the term "Mack Daddy."  For the reasons set forth below, summary judgment will be granted to the college as to her claim for discrimination, but denied as to the claim for retaliation.

## I.      Background

The facts set forth below are undisputed except as noted.

### A.      Factual Background

On August 20, 2012, Marlyne Campbell was hired by Bristol Community College as a "Career Development Counselor."  (Def. SOF ¶ 8, 93).[1]  Campbell's appointment was to run from August 20, 2012, to June 30, 2013.  (Def. Ex. A at 40).  Her appointment was subject to the collective bargaining agreement between the Board of Higher Education and the Massachusetts Community College Council.  The CBA provided, among other things, that for the first six months of her employment, Campbell would be a "probationary employee" who could be terminated without cause.  (*Id.* at 58).

Bristol Community College is a public community college that serves more than 9,000 students.  (Def. SOF ¶ 1).  The college has campuses in Fall River, New Bedford, Attleboro, and

---

[1] Campbell's position was also referred to as a "Navigator."

Taunton, Massachusetts.  (*Id.*).

Campbell has a bachelor's degree in social work, a master's degree in education, and a doctorate in theology.  (*Id.* ¶ 18).  She was hired as part of the Massachusetts Community College Workforce Development Transformation Agenda ("MACCWFDTA"), an initiative supported by a $20 million federal grant given to community colleges in Massachusetts.  The initiative was intended to help provide certificate or degree programs for unemployed or under-employed students.  (*Id.* ¶¶ 9-10).  Her job included providing various academic services to students, supporting outreach to unemployed and under-employed workers, and tracking and reporting student participation and progress.  (*Id.* ¶ 16).

On August 28, 2012, Anthony Ucci, the college's Associate Vice President for Academic Affairs, asked Campbell if she was "part of the 'Mack Daddy' grant."  (*Id.* ¶ 102).  According to Campbell, she asked Ucci if he knew what "Mack Daddy" meant; when he said he did not, she told him that she found the term offensive because she thought it referred to a black pimp.  (*Id.* ¶ 103-04).  Ucci apologized to Campbell and told her that he did not know the term carried that meaning.  (*Id.* ¶ 105).

Campbell has submitted an exhibit that provides definitions of the term "Mack Daddy" from a variety of sources.  According to the exhibit, the Merriam-Webster Dictionary defines it as a slang term meaning "a conspicuously successful pimp"; "a slick womanizer"; and "one that is the best."  (Pl. Ex. 7 at 2).  The exhibit also provides quotes and URL links to various other online dictionaries (including slang and urban dictionaries) and at least one blog.  (*Id.* at 2-8).  The sources generally agree that the term refers principally to a successful pimp or womanizer.  (*Id.*).

On August 30, 2012, Campbell attended the college's annual professional day.  (*Id.* ¶

107).  During a presentation, the college's President, John Sbrega, used the term "Mack Daddy" to refer to the grant program.  (*Id.* 108).[2]

As Campbell was leaving, Dean Richard Driscoll asked Campbell if she was "part of the 'Mack Daddy' grant."  (*Id.* ¶ 109).  Campbell told Driscoll that the term was a racial slur and Driscoll responded that he did not know that.  (*Id.* 109-110).

Within a week of the professional day, Campbell contends that she spoke with Gloria Saddler, a BCC administrator, and told her that she had been upset by Sbrega's use of the term. (Campbell Dep. at 67-68).

On September 5, 2012, Campbell attended her first staff meeting with her supervisor, Kristen McKenna, and two other co-workers, Dolores Gatley and Kayla Medeiros.  (*Id.* at 71).[3] At the meeting, according to Campbell, she asked McKenna why the MACCWFDTA grant had been referred to as "Mack Daddy."  (Def. SOF ¶ 112).  McKenna told the group that she would bring concerns about the term to Jennifer Freeman, the overall director of the program.  (*Id.* ¶ 114).

At some point in early September, McKenna raised concerns about the term at a statewide meeting of the program's directors.  (*Id.* ¶ 115).  McKenna decided to voice the issue because of Campbell's concerns, and because each of the colleges had been referring to the program by a different name.  (*Id.* ¶ 117).  Although she did not believe the term had a racial connotation, McKenna herself thought it could be used to refer to a pimp, and therefore was inappropriate.  (*Id.* ¶ 118).  The directors from each of the 15 community colleges involved in the

---

[2] Campbell alleges that Michael Bensick, a college employee in the Behavior Sciences Department, also used the term "Mack Daddy," although she does not recall when and where he used the term.  (*Id.* ¶ 111).

[3] McKenna was the director of the grant program and acted as Campbell's immediate supervisor. McKenna reported to Carmen Aguilar, the Dean of Workforce Development, and Joan Menard, the Vice President of Workforce Development.  (Def. SOF ¶¶ 11, 12).

grant program agreed to no longer refer to it by that term, and resolved instead to calling it the "Transformation Agenda." (*Id.* ¶ 116).[4]

On September 7, 2012, Amilcar Ferreira, a vocational counselor at the Fall River Career Center (where Campbell was at times assigned to work) spoke about the "Mack Daddy grant." (*Id.* ¶ 120). Ferreira was not, however, an employee of the college. (*Id.*). Campbell told Ferreira that the term was "racial" and was "very offensive" to black people. (*Id.* ¶ 121).

On September 10, 2012, Campbell told Tafa Awolaju, the college's Vice President of Human Resources, about the use of the term. (*Id.* ¶¶ 122, 126).

On September 19, 2012, Campbell was at a student enrollment meeting with approximately ten people when she again heard the term "Mack Daddy." (*Id.* ¶ 123). She explained to everyone what the term meant to her, and stated her view that the term was a racial slur because she believed it was a reference to President Obama. (*Id.* ¶ 124).

Later in September, McKenna "started to feel that [Campbell] was not fulfilling [her] job duties." (McKenna Dep. at 65). McKenna "started to feel that [she] was a difficult person to work with" because, in her view, she was "disruptive in staff meetings" and would argue with her colleagues. (*Id.* at 66). In particular, McKenna noted that Campbell would argue with Dolores Gatley; McKenna soon became frustrated that she and Gatley were "acting up." (*Id.* at 66-69).

On October 10, 2012, at a meeting with Medeiros, Gatley, and Campbell, McKenna heard Gatley scream and gasp; when she turned around, she saw Gatley's face had "sandwich on it." (*Id.* at 70-72). According to an incident report filed by McKenna on October 21, 2012,

---

[4] The parties agree that President Sbrega also relayed Campbell's concerns to the 15 directors, but do not state specifically whether he did so at the early September meeting. (*Id.* ¶ 119).

Campbell admitted that she and Gatley had had a disagreement, and that she had "forced food" into her face and "said something like 'eat this.'" (Def. Ex. B at 38).  The incident report also stated that Gatley did not want to share an office with Campbell after that event.  (*Id.*).[5]

Campbell and Gatley also apparently had issues concerning the fact that Gatley would address her by names other than "Dr. Campbell," including "Dr. C," "Ms. C," and "Marlyne." (Def. SOF ¶ 29).  For example, on the evening of October 10, 2012, Campbell sent an e-mail to Gatley with the subject line "Re: Civility" that stated, in part:

> I'm not sure what to do in this situation, but:  you continue to call me out of what I prefer to be called, IT MUST STOP.  On many occasions I've told you how I like to be addressed.  Not sure, if this is how you bully a Black women, [*sic*] but the intimidation is not working.  I'm not flinching.  Are you condescending towards the students?  I hope not.
>
> I'D LIKE TO MAKE A RECOMMENDATION:  Maybe our Transformation Agenda grant will provide CULTURAL COMPETENCY AND OR CULTURAL SENSITIVITY AWARENESS TO THE STAFF?  Diversity must be prevalent and valued before one may be considered culturally competent . . .

(Def. Ex. B at 35).

At some point in October, Campbell sent a letter to McKenna.  (*Id.* at 30).  The letter included various complaints about her work experience, and apparently referred to the fact that Gatley did not call her by her preferred title.  (*Id.*).  The letter also requested a meeting to discuss the issue with McKenna.  (*Id.*).

McKenna responded by letter, and told Campbell, among other things, that Gatley would start calling her "Dr. Campbell."  (*Id.* at 31).  McKenna apparently addressed the issue with Gatley, and Gatley apologized to Campbell.  (Def. SOF ¶ 29).

On November 5, 2012, McKenna sent Campbell an e-mail stating "I need you to update

---

[5] Campbell now appears to deny that she shoved a sandwich into Gatley's face.  (Pl. SOF ¶ 26).

your calendar on a regular basis." (Campbell Dep. at 111).

On November 15, 2012, McKenna sent an e-mail to Campbell and Gatley stating that her supervisors, Aguilar and Menard, "want[ed] to see more progress." (Def. Ex. A at 48). In addition, the e-mail stated that Campbell and Gatley would need to complete counseling note templates for each student they worked with so that Aguilar and Menard could see how many students they were serving each week. (*Id.*).

On November 19, 2012, McKenna sent Campbell a letter after meeting with Joe Vianna, the Director of the Fall River Career Center, and Amilcar Ferreira, a Vocational Counselor at the Center. (*Id.* at 44).[6] The Career Center was a "partner" of the college, and Campbell was assigned to work at the Center between 9 a.m. and 5 p.m. every Monday, Tuesday, Thursday, and Friday. (*Id.*). Among other things, the letter advised Campbell that the Center had "concerns" about her performance, including "difficulty placing students with [her] for appointments because [it] [was] not certain where [she] [was]" at times. (*Id.*). To help resolve the issue, she was asked to sign in every day at the Center's front desk. (*Id.*). In addition, the letter advised Campbell that she would be required to go to the Attleboro and Taunton campuses on December 5, and 6, respectively. The letter also reminded Campbell of the importance of regularly contacting students, attending counseling meetings, and collaborating with co-workers. It also asked her to stop using the title of "pastor" on her business cards. (*Id.* at 45). McKenna concluded the letter by saying, "[p]lease make every attempt to meet the above requirements over the next 30 days, and at that time we will reevaluate how our mutual and beneficial partnership is progressing." (*Id.*).

On November 23, 2012, McKenna sent Campbell another e-mail that stated, among other

---

[6] The college refers to the letter as a "Thirty Day Warning Letter," a title that Campbell disputes.

things, that she needed to focus on

> being on time and accessible to the career center staff, getting the invites for orientation out, calling students, promoting [the college's] programs, documenting your counseling notes, writing down your questions and preparing your weekly report, attending the Friday meeting and above all meeting with clients and students.

(*Id.* at 49).

On November 26, 2012, McKenna sent an e-mail concerning Campbell's performance to Aguilar and Lisa Tarantino, the Associate Director of Human Resources for the college.  (Def. Ex. B at 34).  The e-mail stated that Campbell "exhibits some unstable behavior," was "very undisciplined, unorganized, lost, and confused," and was not "qualified" for the job.  (*Id.*). McKenna also stated that since her e-mail on November 19, Campbell had been "extremely emotional and unstable."  (*Id.*).  She concluded, "I am very sensitive to employee's rights and I want to be respectful of the process.  However . . . I think we may want to consider if this is working out to the benefit of the grant and the college."  (*Id.*).

On December 2, 2012, McKenna e-mailed Gatley and Campbell and essentially relayed the message that Menard wanted them to increase their "contact with the general public."  (Def. Ex. A at 50).

On December 3, 2012, Campbell e-mailed McKenna and asked to be put on the staff meeting agenda for December 12, if she "last[ed] until" then.  (Def. Ex. A at 52).  McKenna e-mailed her and told her that she would "save her a slot" at the staff meeting.  (*Id.*).

On December 5, 2012, Campbell was scheduled to work at the Attleboro Career Center. According to the college, none of its staff reported seeing Campbell on that day and she did not sign the Center's attendance log.  (Def. SOF ¶ 72).  In fact, the college contends that a staff member reported seeing McKenna at the Attleboro Center on only one occasion during her entire

tenure.  (Def. SOF ¶ 73).  At her deposition, Campbell testified that she went to the Attleboro

Career Center on December 5, that she signed in, and that she was there between approximately

9:15 a.m. and 12:00 noon.  (Campbell Dep. at 130).   It is unclear whether Campbell still

contends that she went to Attleboro on December 5; in her response to the college's statement of

undisputed facts, Campbell states that Ferreira told her to stay in Fall River that day.  (Pl. Resp.

to Def. SOF ¶ 72).

On December 12, 2012, Campbell submitted 51 new-student forms to Medeiros.

However, according to the college, many were duplicates submitted in error.  (Def. SOF ¶ 74).

Campbell states that she "disagree[s]" with that contention, but does not appear to dispute the

underlying allegation; instead, she disputes only the date when she was given notice of the

mistake.  (Pl. Resp. to Def. SOF ¶ 74).

On December 17, 2012, Campbell met with Awolaju and Tarantino.  (Def. SOF ¶ 81).

During the meeting, she expressed concerns that her lack of resources and workload had been

assigned to her in a discriminatory manner.  (Campbell Dep. at 148-49).  The parties disagree as

to whether Campbell stated that she was being discriminated against based on her race; Campbell

contends that she did, and the college contends that she did not.  Later in the meeting, she again

expressed concern that employees had been referring to the program as the "Mack Daddy" grant

and stated that she believed the term meant "pimp."  (Def. SOF ¶ 84).  Awolaju responded that

he did not know of a negative connotation for "Mack Daddy."  He told her, however, that the

college took her concerns seriously, that he would review the matter, and that she could file a

formal complaint.  (Def. SOF ¶ 86).  The college contends that Campbell "indicated that she did

not want to file a complaint but wanted a new position with less responsibilities."  (Def. SOF ¶

87).  Campbell denies that she said this.

On December 19, 2012, McKenna wrote a letter addressed to Campbell "in regards to [her] job performance." (Def. Ex. B at 33). McKenna referred to the November letter and repeated the "concerns" raised in that letter. As to her attendance, McKenna noted that, although she had started to sign in on the Fall River attendance log, she had been reported as absent from the Attleboro Career Center on December 5 and had not signed in on that day. In addition, McKenna noted that she had only participated in one of the two required bi-weekly counselor meetings. McKenna did, however, note that she had agreed not to use the title of "pastor" during work. The letter concluded with the following:

> Regardless of my concerns over December 5, 2012, I feel your Employment at [the college] as the Career Navigator is not working out. Sadly, you have too many challenges in this position and you are unable to fulfill the duties of the job. Some of my observations are your inability to organize your work, work efficiently and maintain records. Paperwork returned to [Medeiros]on December 12, 2012, consisted of 22 duplicates for the same individual clients, not 51 new students you claimed to [Medeiros].
>
> I know you have struggled with some of these aspects and given the timeframe of the grant, we need to make more progress on student outcomes with someone who is prepared to do the job. Therefore it is in the best interest of this grant and [the college]to recommend terminating your employment immediately.

(*Id.*).

On December 26, 2012, Campbell received a call from the Human Resources Department telling her to "come in" and see Awolaju. (Campbell Dep. at 143). Awolaju informed her that she had been terminated from her job and handed her a letter, dated December 26, stating that she was "dismissed from [her] employment at [the college]." (Def. Ex. A at 55).[7]

It appears that on January 31, 2013, Campbell filed a grievance with the college that alleged that the college had breached its contract with her by not providing her with an "E-7

---

[7] Although December 26 would be Campbell's last day of work, the college's policy allowed her to remain on the payroll for an additional three months—that is, until March 26, 2013. (*Id.*).

form." (Def. Ex. A at 64).[8]

On February 19, 2013, Campbell sent a letter to Sbrega that "share[d] [her] concerns" about the "treatment" she had received at the college. (*Id.* at 69). Campbell wrote that she had been "repeatedly . . . subjected to an offensive racial slur," "Mack Daddy," while working at the college. (*Id.*). The letter continued: "[a]s an African American Women [sic] and the President Barack H. Obama also an African American having the Massachusetts Community College Workforce Devolvement [sic] Transformation Agenda being referred as the Mack Daddy Grant is unacceptable and inappropriate, to say the least." (*Id.* at 70). In addition, she wrote that she had been retaliated against for voicing her concerns about the term with Human Resources on December 17, 2012. (*Id.*).

Sbrega forwarded the letter to Awolaju, who responded on March 12, 2013. (*Id.* at 59). Awolaju told her that "the College does not share your views or characterization" of the events leading to her firing. (*Id.*). He wrote that she had been fired due to "significant performance issues." (*Id.*). He also wrote that that at their December 17 meeting, she had "acknowledged" her "poor performance" and "anticipated" that she was "going to be fired." (*Id.*).

On April 11, 2013, the college denied Campbell's grievance.

**B.      Procedural History**

On September 13, 2013, Campbell filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") that alleged the college had discriminated against her "on the basis of age, race and color and retaliation." (Def. Ex. K).

---

[8] Both parties refer to the grievance as having been filed on April 11, 2013. The grievance actually appears to have been filed on January 31, 2013, and was not denied until April 11, 2013. (Def. Ex. A at 69).

On May 28, 2015, the MCAD found that Campbell's claim "lack[ed] . . . probable cause." (Def. Ex. L).

Campbell appealed the MCAD's finding and a hearing was held on August 20, 2015. (Def. Ex. M). On September 28, 2015, the MCAD's finding was affirmed, and on April 15, 2016, the EEOC adopted the MCAD's finding. (*Id.*; Def. SMF ¶ 151).

On June 23, 2016 Campbell filed this action. The original complaint alleged claims for hostile work environment, discrimination on the basis of race, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as well as state-law claims arising out of the same facts.

On February 23, 2017, the Court dismissed the Title VII claim for hostile work environment and the state-law claims. The college then filed this motion for summary judgment.

## II.     **Standard of Review**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986) (footnote omitted) (internal quotation marks omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id*. at 256-57.

## III.   Analysis

### A.   Local Rule 56.1

The college first contends that Campbell failed to comply with Local Rule 56.1.  Local Rule 56.1 requires, in part, that a party opposing a motion for summary judgment must "include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  District of Massachusetts Local Rule 56.1.  According to the college, Campbell "completely fail[ed] to comply with" the rule because she did not include a statement of material facts, and instead only responded to the statement of material facts filed by the college.  The college contends that the Court should consider all of its statement of facts to be undisputed.

Campbell did in fact file a document entitled "Plaintiff's Statement of Material Facts in Dispute."  (Docket No. 116).  Although that statement largely consists of Campbell's responses to the facts asserted by the college, it does assert some independent facts, albeit not always in the clearest manner.  In any event, however, her statement makes clear which of the college's "material facts" she disputes, and provides citations to the evidence.  Accordingly, while perhaps imperfect, her response in substance complies with the rules, and has not greatly prejudiced the college or created significant confusion for the Court in determining which material facts are at issue.  Accordingly, the Court will not consider all of the college's asserted facts to be undisputed, nor will it grant summary judgment in favor of the college on that basis.[9]

---

[9] Campbell's statement did, however, fail to respond to two of the college's asserted material facts.  Those facts will therefore be deemed admitted, though they do not appear to be of any substantial consequence to the

**B.**     **Discrimination**

The complaint alleges that the college discriminated against Campbell in violation of Title VII of the Civil Rights Act of 1964 by firing her because of her race.  Under Title VII, it is unlawful for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Where, as here, there is no direct evidence of discriminatory intent in a Title VII case, the Court employs the burden-shifting analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, the burden falls initially to a plaintiff to set forth a *prima facie* case of discrimination.  411 U.S. at 802.  A properly-established *prima facie* case gives rise to an inference of intentional discrimination.  *See Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005).  The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for its decision.  *Id.*  "If the employer does so, the burden of production reverts to the plaintiff, who must then prove that the employer's neutral reasons were actually a pretext for the alleged discrimination."  *Id.*

**1.**     ***Prima Facie* Case**

To establish a *prima facie* case of discrimination, Campbell must show (1) that she is a member of a protected class; (2) that she performed her job at an acceptable level; (3) that she was terminated; and (4) that the employer filled her position with another individual with qualifications similar to her own.  *Windross v. Barton Protective Services, Inc.*, 586 F.3d 98, 103 (1st Cir. 2009).  Although the burden of establishing a *prima facie* case lies with the plaintiff, a *prima facie* case requires only "a small showing, that is not onerous, and is easily made."

---

motion.  Fact 38 provides that Campbell was "issued an iPad and told to work with Medeiros to learn how to use it" after Campbell had complained that the college's computers worked slowly.  Fact 42 provides that Campbell "failed to inform McKenna of changes to her schedule, including documenting an absence on December 5, 2012."

*Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal quotations omitted).

At the outset, there appears to be no dispute concerning the first and third requirements. As an African-American, Campbell is clearly a member of a protected class, and both parties agree that the college terminated her employment. The parties' main point of dispute concerns the second requirement— that is, whether Campbell can show that she performed her job at an acceptable level.

As noted, Campbell was a probationary employee who was on the job for only four months. The college contends that she "had a poor attendance and tardiness record[,] which adversely impacted the students and Career Center customers who relied on her services"; that she "miss[ed] staff meetings"; and that she "demonstrated an overall inability to stay organized, [] work efficiently, and [] properly maintain records." (Def. Mem. at 19). The college further alleges that those "performance issues [are] supported by contemporaneous documentation and observations by her supervisor . . . as well as individuals outside of the college who relied on" her services. (*Id.*).

The college has submitted substantial evidence in support of its contentions. A few examples of evidence in particular suggest substandard performance.

First, the college submitted an "incident report" concerning an episode on October 12 where Campbell shoved a sandwich into a co-worker's face after a disagreement. (Def. Ex. B at 38). Campbell does not dispute that the incident occurred.

Second, the college submitted a letter sent by Kristen McKenna, Campbell's supervisor, on November 19 that it describes as a "Thirty-Day Warning Letter." (Def. Ex. A at 44). Among other concerns, the letter stated that a co-worker at one of the college's career centers was "ha[ving] difficulty placing students with [Campbell] for appointments because he [was] not

certain where [she was]." (*Id.*). The letter also reminded her of the importance of regularly

contacting students, attending counseling meetings, and collaborating with co-workers, and asks

her to stop using the title of "pastor" on her business cards. The letter concludes by asking her to

"[p]lease make every attempt to meet the above requirements over the next 30 days," at which

time, the college would "reevaluate how our mutual and beneficial partnership is progressing."

(*Id.* at 45).

As to that letter, Campbell contends only that it "does not indicate that it is a warning

letter." (Pl. Mem. at 2). But although the letter may not include the actual word "warning," it

certainly constituted a warning; it made clear that Campbell's supervisor had serious enough

concerns regarding her work performance that the college would be reevaluating her position in

30 days. And she does not challenge the letter's statement that other employees had been having

"difficulty placing students with [Campbell] for appointments because" they were uncertain, at

times, where she was.

Third, the college submitted an e-mail sent by McKenna to other employees on

November 26 stating that Campbell "exhibits some unstable behavior," is "very undisciplined,

unorganized, lost, and confused," is not "qualified" for the job, and suggests the college "may

want to consider" if her employment was "working out." (Def. Ex. B at 34). Campbell does not

address the letter or dispute its contents.

Fourth, the college submitted a letter sent by McKenna to Campbell on December 19 in

which she repeats the concerns she had raised in her November 19 letter. (Def. Ex. B at 33). In

particular, the letter noted that Campbell had been reported absent from the Attleboro Career

Center on December 5, had participated in only one of the two required bi-weekly counselor

meetings, and had reportedly submitted paperwork filled with errors on December 12. (*Id.*). The

letter concluded by telling her that McKenna felt she was unable "to organize [her] work, work efficiently and maintain records," and ultimately that she was "unable to fulfill the duties of the job." (*Id.*).

Although Campbell does address the December 19 letter, her responses are inconsistent.[10]  As to the letter's allegation that she had not attended work at the Attleboro Career Center on December 5, she alleges that "her boss . . . told her to stay in Fall River," and that "there was no staff meeting" that day.  (Pl. Mem. at 4).   In the same paragraph, however, she also alleges that she "disputes McKenna's assertion that she failed to attend the December 5 meeting" and that she did in fact "log[] in on December 5, 2012." (*Id.*).  As to the letter's allegation that she had missed a counselling session, she simply contends that the meeting was cancelled.

Furthermore, Campbell offers little or nothing to suggest that she had been performing her job satisfactorily.  She contends repeatedly that she was "qualified" for the position when she began her employment with the college.  But making a *prima facie* case requires her to show that she was *performing* her job well, not that she was *qualified* for the job at the time of her hiring. *See Caraballo-Caraballo v. Correctional Administration*, 892 F.3d 53, 59 (1st Cir. 2018) (noting that in "discharge . . . cases . . . the plaintiff's ability to satisfy the job qualifications element will ordinarily depend on whether she was successfully performing her job at the time of her discharge . . .").  Indeed, she cites to only two pieces of evidence in support of her contention that she was performing her job in a satisfactory manner.

---

[10] Campbell's contentions as to the December 19 letter are, for reasons that are unclear, written under the heading of "November 19, 2012 Letter" in her memorandum.  Campbell's memorandum does contain a section entitled "December 19, 2012 Letter," but that section states only:  "In this letter Defendant raised the same three concerns as expressed in the November 19, 2012 letter . . . While general concerns were raised in this letter, the three specific concerns constituted the core reasons for termination."

First, Campbell cites McKenna's deposition testimony that "in the beginning of [her] time . . . at the Fall River Career Center," she spoke with Ferreira, who told McKenna that she was doing "very well."  (McKenna Dep. at 93-94).  She provides no date for when Ferreira said this, but it was obviously at the "beginning" of her employment.  Furthermore, as noted, Ferreira was not an employee of the college.

Second, she cites to McKenna's testimony that Joe Vianna, the Director of the Fall River Career Center, "had expressed confidence in [her] ability to communicate well with students and [her] compassion to help students."  (McKenna Dep. at 101).  That contention appears to be based on McKenna's November 19 letter, where she wrote:

> Making contact with . . . clients and students in every way possible is our job and whatever you need to do to make sure you are doing this is paramount.  Mr. Viana [sic] has expressed confidence in your ability to communicate well with students and your compassion to help students so we want you to use those talents to your best ability, and that means you must be available for them as intended.

(Def. Ex. A at 44).  Having the "ability" to perform is, of course, not the same as actually performing.  Furthermore, the letter went on to state that "the Fall River Career Center staff"— including Vianna (and Ferreira)—had expressed "concerns" to McKenna regarding Campbell's job performance, including their "difficulty placing students with [her] for appointments because [they were] not certain where [she] was."  And, again, the purpose of the letter was to put Campbell on notice that her performance had raised significant enough concerns that the college would be "reevaluat[ing]" how her job was "progressing" in 30 days.  Vianna's expression of confidence in Campbell, therefore, can only be reasonably understood as a limited statement contained within a more serious expression of concern.  And like Ferreira, Vianna was not an employee of the college.

In short, there are serious questions as to whether Campbell has provided evidence

sufficient to show that she was performing her job at an acceptable level.  Furthermore, and in any event, it is also unclear whether she has satisfied the fourth requirement of a *prima facie* case—that is, evidence that the college filled her position with an individual with similar qualifications.  Campbell contends only that she "was replaced by a white female."  In support of that contention, she cites to "Plaintiff's Exhibit 3, Deposition of John Sbrega, Exhibit 9."  Although the form of that citation is not particularly clear, it appears to refer to a letter Campbell has submitted to the Court as part of an exhibit.  The letter, which was written on February 24, 2014, appears to be a response sent by the college to an MCAD investigator after the investigator had "request[ed]" "additional information" about Campbell's complaint.  As relevant here, the college appears to state that Campbell was replaced by a 60-year-old white woman named Cheryl Kenney.  (Pl. Ex. 3).  The letter provides no information beyond that.  Whether Kenney had similar qualifications to Campbell is not set forth in the record.

In short, there are ample reasons to conclude that Campbell has failed to establish a *prima facie* case.  In any event, however, even assuming she has done so, her claim for discrimination still fails.  Once a plaintiff has established a *prima facie* case, the burden shifts to the employee to provide a legitimate, nondiscriminatory reason for its decision.  The college easily satisfies that requirement here.  As noted, there is extensive evidence that Campbell was performing her job poorly, and that the college terminated her for that reason.

The burden then shifts back to Campbell, who must show that the stated reason was actually a pretext for discrimination.  Campbell appears to offer various contentions as to why the college's stated reason for her firing—that she was performing her job inadequately—was pretextual.

First, Campbell refers to the letter Awolaju sent to her on March 12, 2013.  She states that

his claim about her poor work performance was "a general statement," and that President Sbrega "acknowledged" that Awolaju's statement was "general." (Pl. Mem. at 7). It is entirely unclear what Campbell means by this, and in any event, she offers nothing to indicate how a "general" statement would undercut the college's stated rationale.

Second, Campbell states in conclusory terms that the "reasons advanced by [the college] are false." (*Id.* at 8). But she offers nothing to suggest how or why those reasons are false.

Third, she states that "Dolores Gatley[,] who was the other Navigator[,] did not appear to be African-American." (Pl. Mem. at 8). To the extent she is alleging that she was treated differently than her white colleagues, she has put forth no evidence to show that they were performing their jobs inadequately, or even that Gatley was treated differently.

Fourth, she contends that she was not given the "progressive discipline" she should have been given, in the form of "oral warnings, written warnings and suspensions." (*Id.*). In support of that argument, she cites to portions of the deposition of Anthony Ucci. (Pl. Ex. 6). The cited testimony, however, only provides that in Ucci's view, it was "definitely a possibility" that an employee's "second level [of discipline] would be a written warning," and that it "seems like a reasonable progression" that an employee whose "performance didn't improve" after a written warning would be suspended. (*Id.* at 17). The undisputed evidence shows that Campbell was repeatedly warned by McKenna—both orally and in writing—that her performance was inadequate. Moreover, she was only a probationary employee, and there is no evidence that the system of progressive discipline applied equally to probationary and regular employees.

Taken as a whole, that evidence is insufficient to establish that the reasons provided by the college for the termination of Campbell's employment were pretextual. Accordingly, therefore, even if she has established a *prima facie* case, she cannot show that the college's stated

reason for firing her was pretextual.  Summary judgment on Campbell's claim of employment discrimination will therefore be granted to the college.

### C.      Retaliation

The college also seeks summary judgment on Campbell's claim of retaliation under Title VII.  Section 704(a) of Title VII makes it unlawful for an employer to retaliate against an employee for engaging in certain protected activity. *See* 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation, a plaintiff must prove that "(1) [] she engaged in protected activity under Title VII, (2) [] she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity."  *Collazo v. Bristol–Myers Squibb Mfg., Inc.,* 617 F.3d 39, 46 (1st Cir. 2010).

"Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010).  "If the defendant carries this burden of production, the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation."  *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (citing *Collazo*, 617 F.3d at 46).

Ultimately, "[t]o defeat summary judgment, the plaintiff need not prove retaliation by a preponderance of the evidence." *Id.*  Instead, "[a]ll a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." *Collazo*, 617 F.3d at 50 (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000).

Campbell contends that she was fired by the college in retaliation for complaining to Awolaju on December 17 about her colleagues' use of the term "Mack Daddy," a term she understood to be a racial slur.

1.      *Prima Facie* **Case**

    a.      **Protected Activity**

The college contends that Campbell cannot establish that she participated in protected activity by complaining about the use of the term "Mack Daddy." To establish that she has participated in a protected activity, a plaintiff "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999). Instead, she "must demonstrate only that [she] had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Id.*

The college contends that Campbell could not have had an objectively reasonable belief that the use of the term "Mack Daddy" violated Title VII. It relies on a summary order of the Second Circuit, *Sosa v. Local Staff, LLC*, 618 Fed. App'x 19 (2d Cir. 2015), which states that "[t]he objective reasonableness of an employee's belief that the employer has violated Title VII must 'be measured against existing substantive law." Thus, the college continues, because the references to "Mack Daddy" were mere "stray remarks," made "without any racial connotation whatsoever," and because the law is clear that such "offhand" and "isolated" comments cannot constitute violations of Title VII, Campbell's belief that the use of the term violated Title VII was objectively unreasonable. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Under the circumstances, the use of the term "Mack Daddy" cannot be characterized as "stray remarks" or an "isolated incident." It is undisputed that the term was repeatedly used to refer to the grant by a variety of Campbell's colleagues—including the college's president—in both private and in public settings.

It is certainly true that there is no evidence that a single one of those employees knew or

understood that the term could have a racial connotation.  There is also doubt as to whether an objectively reasonable person would consider the term to be racially offensive (as opposed to merely vulgar or inappropriate).  Nonetheless, under the circumstances, the Court cannot say that Campbell's interpretation of the term is so objectively unreasonable that it cannot support a claim for retaliation.

### b.      Causal Link

The college does not dispute that Campbell suffered an adverse employment action, which is the second element of a *prima facie* case.  It does, however, contend that she has failed to show that her termination was causally linked to her having complained to Awolaju, and thus that she has not established the third element of a *prima facie* case.

Campbell's only evidence of a causal link appears to be the temporal proximity between her complaining to Awolaju and her firing.  "[M]ere temporal proximity between an employer's knowledge of protected activity and an adverse employment action," however, may be deemed "sufficient evidence of causality to establish a prima facie case" when the temporal proximity is "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

The First Circuit has held that a period of roughly a month may qualify as sufficiently close in time to establish a prima facie case.  *See Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 25 (1st Cir. 2004).  Accordingly, therefore, the small amount of time between Campbell's last complaint (on December 17) and her firing (on December 20) —a period of roughly nine days—is sufficient to establish a reasonable inference of a causal link.

Accordingly, the Court concludes that Campbell has established a *prima facie* case of retaliation.

### 2.      Legitimate Explanation

Because Campbell has made a *prima facie* case, the burden shifts to the college to articulate a legitimate, non-retaliatory explanation for its decision to fire her.  *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010).  As discussed, there is substantial evidence that the Campbell's supervisors had legitimate concerns about her performance as a college employee, and that the college notified her of these concerns.  Accordingly, the college's explanation that it terminated her due to her continued poor work performance satisfies its burden to establish a non-retaliatory explanation for its decision.

### 3.   Pretext

Because the college has carried its burden, "the burden shifts back to [Campbell] to show that the [college's] explanation is a pretext for unlawful retaliation."  *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (citing *Collazo*, 617 F.3d at 46).

Campbell "need not prove retaliation by a preponderance of the evidence."  *Id.*  (citing *Collazo*, 617 F.3d at 50).  Instead, "[a]ll [Campbell] has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action."  *Id.* (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000).

Campbell has satisfied that burden here.  There is certainly abundant evidence to support the college's contention that it fired her due to her poor performance, and there is not sufficient evidence to prove that she was terminated on the basis of racial discrimination.  Nonetheless, there is sufficient evidence to create an issue of material fact as to whether her termination was causally connected to her protected activity.  Accordingly, the Court will not grant summary judgment on Campbell's claim of retaliation.

## IV.   Conclusion

For the foregoing reasons, the motion of defendant Bristol Community College for

summary judgment is GRANTED as to plaintiff's claim of employment discrimination on the basis of race and is DENIED as to her claim of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  August 22, 2019                    United States District Judge